**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BARBARA J. MACKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:10CV2293SNLJ(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Barbara J. Macke for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security Income benefits under Title XVI of the Act. The

cause was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the

Complaint. (Document Number 16). Defendant has filed a Brief in Support of the Answer.

(Doc. No. 17). Plaintiff has filed a Reply. (Doc. No. 18).

**Procedural History**

On December 15, 2008, plaintiff filed her application for benefits, claiming that she

became unable to work due to her disabling condition on January 1, 2001. (Tr. 95-101). This

claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated May 5, 2010. (Tr. 42-47, 9-18).

- 1 -

On October 16, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.     ALJ Hearing

Plaintiff's administrative hearing was held on January 25, 2010. (Tr. 24). Plaintiff was present and was represented by counsel. (Id.). Vocational expert Doris Gonzalez was also present. (Id.).

Plaintiff's attorney indicated that he had requested a report from plaintiff's psychiatrist but had not yet received the report. (Id.). The ALJ stated that he would allow plaintiff thirty days to submit additional evidence. (Id.).

The ALJ examined plaintiff, who testified that she had a bachelor's degree in psychology. (Tr. 25). Plaintiff stated that she also completed an associate's degree program to obtain an RN license. (Id.). Plaintiff testified that her RN license was suspended due to alcohol abuse. (Id.). Plaintiff stated that she worked as a nurse for about ten years. (Id.).

Plaintiff testified that she resided in a nursing home from October 2008 through August 2009. (Tr. 25-26). Plaintiff stated that she was released in August 2009 because a spot opened in Harris House, which is a "sober house." (Tr. 26). Plaintiff testified that she left Harris House in November 2009 and moved in with her parents. (Id.).

Plaintiff stated that she worked at the Dollar Store and Walgreens since she left the nursing home. (Id.). Plaintiff testified that she left these positions because she was unable to do the work. (Id.). Plaintiff stated that she became very flustered when she made mistakes. (Id.).

Plaintiff testified that she had no access to alcohol at the nursing home. (Tr. 27). Plaintiff stated that she was sober at Harris House. (Id.). Plaintiff testified that she drank for two days after leaving Harris House in November 2009, but she has not had a drink since that time. (Id.).

Plaintiff stated that she looks for jobs in the classified ads. (Id.). Plaintiff testified that she has sent out some resumes but has not received any responses. (Id.).

Plaintiff stated that she is unable to work under any kind of stress at all. (Id.). Plaintiff testified that, even though she has not been drinking, she has difficulty concentrating. (Id.). Plaintiff stated that she has difficulty reading and must constantly go back and re-read pages. (Tr. 28).

Plaintiff testified that she drives. (Id.). Plaintiff stated that she goes with her parents to doctor appointments, shops for groceries, and helps with household chores. (Id.).

Plaintiff testified that she saw a doctor at Family Care Center, a clinic, when she lived at Harris House. (Id.). Plaintiff stated that she saw this doctor one time and that he continued the medications she was taking at the nursing home. (Id.). Plaintiff testified that she saw a psychiatrist one time and that he adjusted her medications. (Tr. 29).

Plaintiff stated that she has not seen a psychiatrist since she left Harris House, but she has had her medications refilled. (Id.). Plaintiff testified that she does not have a primary care physician because she has not needed one. (Id.). Plaintiff stated that she has not looked into facilities that provide mental health services based on ability to pay. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she was living alone before she was admitted at the nursing home. (Id.). Plaintiff stated that she did not work for at least a year prior to being admitted to the nursing home. (Tr. 30). Plaintiff testified that she was in a

house fire at her home. (Id.). Plaintiff stated that she was admitted to a hospital after she attempted suicide. (Id.).

Plaintiff testified that she did not have a drink from the time of the house fire until the two-day event in November 2009. (Id.). Plaintiff stated that she did not have a drink from the time of the two-day episode in November 2009 to the date of the hearing. (Id.).

Plaintiff testified that she received thirty days of in-patient psychiatric care in 1992. (Id.). Plaintiff stated that she was diagnosed with alcohol abuse and major depression. (Id.).

Plaintiff testified that she has a sponsor for Alcoholics Anonymous ("AA"). (Tr. 31). Plaintiff stated that she regularly attended AA meetings when she lived at Harris House, but she no longer attends on a regular basis. (Id.).

Plaintiff testified that the nursing home was a "locked down" nursing home. (Id.). Plaintiff stated that she lived there for about ten months. (Id.). Plaintiff testified that she received regular psychiatric medication at the nursing home. (Id.). Plaintiff stated that the prescriptions for the medications she was taking in the nursing home were renewed. (Tr. 32).

Plaintiff testified that she does not have any kind of medical insurance. (Id.). Plaintiff stated that she does not qualify for Medicaid. (Id.). Plaintiff testified that she had only had her medications filled on one occasion and that she had them filled at a clinic. (Id.).

Plaintiff stated that she worked as a cashier at Walgreens. (Id.). Plaintiff testified that she was unable to perform this work because she felt intimidated by customers. (Id.). Plaintiff stated that she had anxiety about performing her job and became stressed out when she made mistakes. (Tr. 33).

Plaintiff testified that she functioned well when she was in college. (Id.). Plaintiff stated

that she worked in a factory and as a bank teller in the past.  (Id.).

Plaintiff testified that she lived on her savings after she left the nursing field.  (Id.).
Plaintiff stated that she also performed some temporary jobs, including positions in factories and
warehouses.  (Tr. 34).

The ALJ re-examined plaintiff, who testified that she worked at Convenient Food Mart
from 1995 to 1996.  (Id.).

Plaintiff stated that she worked at Missouri Medicaid as a case manager for a year in 2000.
(Id.).

The ALJ noted that he would send plaintiff for a psychological evaluation by Social
Security's psychologist.  (Id.).

The ALJ then examined the vocational expert, Ms. Gonzalez.  (Tr. 35).  The ALJ asked
Ms. Gonzalez to assume a hypothetical claimant with the following limitations: able to perform
the full range of light work; able to understand, remember, and carry out at least simple
instructions and non-detailed tasks; can demonstrate adequate judgment to make simple work-
related decisions; can respond appropriately to supervisors and co-workers and can adapt to
routine simple work changes; should not work in a setting which includes constant or regular
contact with the general public; should not perform work which includes more than infrequent
handling of customer complaints; and should not work in close proximity to available controlled
substances.  (Id.).  Ms. Gonzalez testified that the individual would be unable to perform any of
plaintiff's past work.  (Tr. 36).  Ms. Gonzalez stated that the individual could perform work as a
production assembler, which is light and unskilled (280,160 positions nationally, 6,320 in
Missouri); and electrode cleaner, which is light and unskilled (539,350 positions nationally,

11,330 in Missouri).  (Id.).

The ALJ stated to plaintiff that her appointment with the psychologist was "pretty important," and that it was the "best way to get to the bottom of the situation, given the state of the medical."  (Tr. 37).

## B.    Relevant Medical Records

The record reveals that plaintiff was brought to the emergency room at DePaul Health Center by her family on September 11, 2008 due to severe confusion.  (Tr. 196).  It was noted that plaintiff had a history of alcohol abuse and binge drinking, where she would not communicate with the family for four to five days and following which she would have one to two weeks of a clear state where she would help her parents with their medications and house chores.  (Id.).  Plaintiff's mother reported that plaintiff's house burned down a few days prior and because of this plaintiff was very depressed. (Id.).  Plaintiff complained of severe headache and became increasingly confused.  (Id.).  Upon examination, plaintiff was extremely confused and only responded to her name.  (Id.).  Plaintiff's drug screen was negative.  (Tr. 197).  The assessment of examining physician Fatma A. Khan, M.D., was acute encephalopathy[1] with delirium, likely alcohol withdrawal, rule out meningitis and seizures; alcohol abuse with history of binge drinking; depression; and anxiety.  (Id.).  After undergoing testing, it was determined that plaintiff's symptoms were highly consistent with alcohol. withdrawal and delirium tremens.[2]  (Tr. 194).  On September 14, 2008, plaintiff was transferred to the psychiatric floor for further psychiatric care and inpatient detoxification.  (Id.).

---

[1]Any disorder of the brain.  Stedman's Medical Dictionary, 636 (28th Ed. 2006).

[2]A severe, sometimes fatal, form of delirium due to alcohol withdrawal following a period of sustained intoxication.  Stedman's at 506.

Vadim Baram, M.D. performed a psychiatric evaluation on September 14, 2008, at DePaul Health Center. (Tr. 300-01). Plaintiff reported that she ha burned down her house when she was drunk and subsequently took an overdose of medication because she either wanted to kill herself or sleep. (Tr. 300). Plaintiff indicated that she was unemployed and was taking care of both of her elderly parents. (Id.). Plaintiff reported that she had been binging on alcohol since ninth grade with intensification for the past year. (Id.). Plaintiff indicated that she was in substance abuse treatment at Kansas City in the past and that she attended AA groups on and off. (Id.). Plaintiff reported that she had never seen a psychiatrist and never attempted suicide before. (Id.). Plaintiff was very tearful and depressed during the interview and reported poor sleep and impaired appetite. (Id.). Plaintiff reported that she felt hopeless and helpless at time and stated that she cannot stop her alcohol habit. (Id.). Upon mental status examination, Dr. Baram noted mild psychomotor retardation, depressed mood, dysphoric affect, linear thought process, and poor insight and judgment. (Id.). Plaintiff endorsed suicidal ideation without a plan and denied homicidal ideation. (Tr. 301). Dr. Baram diagnosed plaintiff with major depressive disorder,[3] severe single episode; alcohol dependence; and assessed a GAF[4] score of 25.[5] (Id.). Dr. Baram recommended a "full spectrum of biopsychosocial

_____

[3]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's at 515.

[4]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[5]A GAF score of 21 to 30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). DSM-IV at 32.

interventions," including psychotherapy and medication.  (Id.).  Plaintiff participated in an alcohol

detoxification program and dual-diagnosis management groups.  (Tr. 296).  Plaintiff was discharged

on September 20, 2008, at which time she was feeling better, her mood was good, and her insight and

judgment were fair.  (Id.).  Plaintiff's discharge diagnoses were major depressive disorder, severe,

single episode; alcohol dependence; rule out alcohol-induced mood disorder; and a GAF score of 57.[6]

(Id.).  Plaintiff's discharge medications were Campral,[7] Depakote,[8] Lexapro,[9] and Metoprolol.[10]  (Id.).

 Dr. Baram recommended that plaintiff see a psychiatrist and participate in AA groups.  (Id.).  He

indicated that plaintiff's prognosis was questionable.  (Id.).

Plaintiff was admitted to DePaul Health Center on September 22, 2008, after she attempted

suicide by drinking alcohol and antifreeze.  (Tr. 293).  Plaintiff was stabilized.  (Id.).  Plaintiff saw Dr.

Baram on October 2, 2008, at which time she reported that she was feeling okay and denied current

suicidal or homicidal ideations.  (Tr. 228).  Dr. Baram diagnosed plaintiff with substance induced

mood disorder with depressive symptoms, history of major depression, and alcohol dependence.  (Tr.

---

[6]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

[7]Campral is indicated for the maintenance of abstinence from alcohol in patients with alcohol dependence who are abstinent at treatment initiation.  See Physician's Desk Reference (PDR), 1158 (63rd Ed. 2009).

[8]Depakote is indicated for the treatment of manic or mixed episodes associated with bipolar disorder, with or without psychotic features.  See PDR at 423.

[9]Lexapro is indicated for the treatment of major depressive disorder.  See PDR at 1175.

[10]Metoprolol is indicated for the treatment of hypertension, angina pectoris, and heart failure.  See PDR at 668.

229).  He assessed a GAF score of 50.[11]  (Id.).  Dr. Baram recommended that plaintiff be transferred to an inpatient substance abuse treatment program when medically clear.  (Id.).  On October 14, 2008, Dr. Baram noted that plaintiff had been transferred from the medical floor to the psychiatric floor.  (Tr. 293).  Plaintiff was very tearful and stated that she felt she was a burden to her family.  (Id.).  Plaintiff's mood was depressed, plaintiff reported fleeting suicidal thoughts, and her insight and judgment were poor.  (Id.).  Dr. Baram diagnosed plaintiff with rule out major depressive disorder, severe without psychosis; and alcohol dependence; with a GAF score of 25.  (Id.).  Dr. Baram indicated that he would resume the full spectrum of biopsychosocial interventions.  (Id.).  Dr. Baram expressed the opinion that plaintiff should be released to a controlled environment such as a residential care facility upon discharge due to the high risk of potential suicide in the future.  (Tr. 293).  Plaintiff was discharged on October 29, 2008, at which time her diagnoses were major depressive disorder, severe without psychosis; alcohol dependence; and a GAF score of 39.[12]  (Tr. 290).  Dr. Baram indicated that plaintiff sowed very limited and poor coping skills and remained continuously in very high suicide risk.  (Id.).  Dr. Baram stated that plaintiff did fairly well in a controlled environment but she did not have any hope for the future and Dr. Baram had significant doubts about her being released on her own.  (Id.).  Plaintiff agreed to proceed with nursing home placement.  (Id.)

---

[11]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.  A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. at 32.

[12]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work).  DSM-IV at 32.

Plaintiff was admitted to Crestwood Health Care on October 29, 2008, at which time it was noted that plaintiff was friendly and pleasant. (Tr. 341). Plaintiff was adjusting to the facility and had no discharge plans at that time. (Id.). On January 14, 2009, it was noted that plaintiff attended groups but was very quiet and does not socialize much with her peers. (Id.).

Linda Dumas, Social Worker, completed a Third Party Function Report on February 1, 2009. (Tr. 140-48). Ms. Dumas indicated that, due to mental illness, plaintiff required assistance with most daily activities including dressing, personal care, feeding, and taking medication. (Tr. 141-42). Ms. Dumas stated that plaintiff was unable to go out alone or handle money. (Tr. 143). Ms. Dumas indicated that plaintiff did not socialize with others. (Tr. 144). Ms. Dumas stated that plaintiff's mental illness affected her memory, concentration, ability to follow instructions, and ability to understand. (Tr. 145). Ms. Dumas stated that plaintiff does not handle stress at all, is easily agitated and gives up, and does not handle change well. (Tr. 146).

A Long-Term Psychiatric Management Initial Evaluation was completed on March 8, 2009, in which it was note that plaintiff's chief complaint was depression and that plaintiff's affect was anxious and tearful. (Tr. 316). Plaintiff's insight was described as fair and her judgment was described as impaired. (Id.). Plaintiff's mood was anxious and depressed. (Id.). Plaintiff was diagnosed with major depression and was assessed a GAF score of 40. (Id.).

Robert Cottone, Ph.D completed a Psychiatric Review Technique on March 23, 2009. (Tr. 317-28). Dr. Cottone found that plaintiff suffers from probable alcohol encephalopathy, mood disorder or substance-induced mood disorder, and substance addiction disorder. (Id.). Dr. Cottone expressed the opinion that plaintiff has marked limitations in her activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, or pace. (Tr. 325).

Dr. Cottone indicated that plaintiff had three episodes of decompensation, each of extended duration. (Id.). Dr. Cottone indicated that plaintiff met Listing 12.09, the listing for substance addiction disorder. (Tr. 327). Dr. Cottone expressed the opinion that "[w]ith sustained abstinence her symptoms should remit to a degree she can work simple work." (Id.).

Dr. Cottone completed a Mental Residual Functional Capacity Assessment. (Tr. 329-31). Dr. Cottone expressed the opinion that plaintiff was markedly limited in her ability to understand and remember detailed instructions, and carry out detailed instructions; and moderately limited in her ability to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with other without being distracted by them, complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers without distracting them, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. (Id.). Dr. Cottone concluded that plaintiff could understand, remember, carry out and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to ordinary changes in work routine or setting. (Tr. 331). Dr. Cottone found that plaintiff should avoid work involving intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, close proximity to co-workers, and close proximity to available controlled substances. (Id.).

Plaintiff saw Alison Burner, M.A., Licensed Psychologist, for a psychological evaluation on

February 26, 2010. (Tr. 344-48). Plaintiff reported that she has constant depression, irrational fears, difficulty concentrating, difficulty understanding what she has read, and is easily overwhelmed and confused, gets lost even when going places she has been many times, and has constant suicidal ideation. (Tr. 345). Ms. Burner performed a mental status exam, which revealed a sad affect, tearfulness, and psychomotor retardation. (Tr. 346). Ms. Burner noted that plaintiff moved very slowly and appeared heavily medicated. (Id.). Plaintiff had difficulty providing her year of birth and phone number and required extra wait time to think of these answers which she reported in the past were "second nature." (Id.). Plaintiff reported significant depression with suicidal ideation. (Id.). Plaintiff's immediate memory was not intact, although her recent and past memory were adequate. (Id.). Plaintiff was unable to add, subtract, multiple and divide single digits at an appropriate level. (Id.). Plaintiff's mental control was inadequate. (Id.). Plaintiff's insight and judgment were within the average range and her attention and concentration were adequate. (Id.). Plaintiff reported that she was unable to care for herself without assistance due to her memory problems. (Id.). Ms. Burner found that plaintiff was of above average intellectual functioning. (Tr. 347). Ms. Burner stated that plaintiff's mental status examination was outside normal limits in terms of short-term memory and mental control and that plaintiff's records have also documented past mental status changes with confusion and disorientation at times. (Id.). Plaintiff reported cognitive changes over the past two years and has been told many reasons for these cognitive changes. (Id.). Plaintiff was afraid what her future may hold as she is no longer independent and was very upset over her loss of functioning. (Id.). Ms. Burner stated that plaintiff "presented a complex clinical picture and without complete neurocognitive testing, a definitive diagnosis is difficult to make." (Id.). Ms. Burner stated that, although plaintiff's DePaul records indicate that her memory issues, mental status changes, and

mental health issues are related to alcoholism, plaintiff had not had a drink in two years and had not experienced any return of functioning. (Id.). Ms. Burner noted that plaintiff meets criteria for depression due to continual suicidal ideation with one severe attempt. (Id.). Ms. Burner stated that plaintiff feels hopeless, helpless, has crying spells, feels anxious and doesn't know why, and generally feels confused and overwhelmed. (Id.). Ms. Burner concluded that there is significant psychological symptomology which would negatively affect obtaining or maintaining employment at that time and likely preclude working. (Id.). Ms. Burner stated that plaintiff reported symptoms consistent with cognitive disorder likely due to early onset dementia which causes personality changes (depression and binge drinking) and mental status changes (confusion and disorientation as well as memory issues). (Tr. 348). Ms. Burner stated that plaintiff has developed multiple cognitive deficits including memory impairment, language disturbance, motor disturbance, and disturbance in executive functioning. (Id.). Ms. Burner indicated that these difficulties have led to loss of independent functioning and plaintiff now cannot live alone and have also led to loss of her nursing job which she said was her "whole life" and she "loved." (Id.). Ms. Burner diagnosed plaintiff with cognitive disorder not otherwise specified[13] and assessed a GAF score of 50. (Id.). Ms. Burner expressed the opinion that plaintiff had marked impairment in her activities of daily living; social functioning; concentration, pace, and persistence; and decompensation in a work setting. (Id.). Finally, Ms. Burner found that plaintiff would be unable to manage her own funds if awarded benefits due to her cognitive/personality changes. (Id.).

Ms. Burner also completed a Medical Source Statement of Ability to Do Work-Related

---

[13]This category is for disorders that are characterized by cognitive dysfunction presumed to be due to the direct physiological effect of a general medical condition that do not meet criteria for any of the specific deliriums, dementias, or amnestic disorders. DSM-IV at 163.

Activities (Mental).  (Tr. 349-51).  Ms. Burner expressed the opinion that plaintiff had extreme limitations in her ability to carry out complex instructions, make judgments on complex work-related decisions, and respond appropriately to usual work situations and to changes in a routine work setting.  (Id.).  Ms. Burner found that plaintiff had marked limitations in her ability to understand and remember simple instructions, carry out simple instructions, make judgments on simple work-related decisions, understand and remember complex instructions, interact appropriately with the public, interact appropriately with supervisors, and interact appropriately with co-workers.  (Id.).  In support of her findings, Ms. Burner stated that plaintiff's mental status and personality changes have led to a significant decrease in the ability to understand and engage in simple tasks.  (Tr. 349).  Ms. Burner stated that plaintiff is easily overwhelmed, has an intolerance for stress, and has difficulty planning, organizing, and sequencing.  (Tr. 350).  Finally, Ms. Burner noted that plaintiff has below average adaptive and daily living skills; erratic and unstable moods, including depressive episodes; and a past history of binge drinking.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant met the insured status requirements of the Social Security Act through June 30, 2006.

2.      The claimant has not engaged in substantial gainful activity since January 1, 2001, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: alcohol induced encephalopathy, major depressive disorder and substance induced mood disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant's impairments, including the substance use disorder, meet sections

12.02, 12.04, and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

5.      If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

6.      If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

7.      If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can understand, remember and carry out at least simple instructions and non-detailed tasks. The claimant is able to demonstrate adequate judgment to make simple, work-related decisions. The claimant can respond appropriately to supervisors and coworkers. She can adapt to routine and simple work changes. She should not work in a setting that includes constant or regular contact with the general public. She should not perform work that includes more than infrequent handling of customer complaints. The claimant should not work in close proximity to available controlled substances.

8.      If the claimant stopped the substance use, the claimant would be unable to perform past relevant work (20 CFR 404.1565 and 416.965).

9.      The claimant was born on August 7, 1959 and was 41 years old, which is defined as a younger individual on the alleged disability onset date (20 CFR 404.1563 and 416.963).

10.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

11.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12.      If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13. Because the claimant would not be disabled if she stopped the substance use (20 CFR 404.1520(g) and 416.920(g)), the claimant's substance use disorder is a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935). Thus, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(Tr. 11-18).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on October 7, 2008, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on December 15, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 18).

## Discussion

### A.   Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf

v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.**     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision,

although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.      Plaintiff's Claims**

Plaintiff argues that the ALJ erred in evaluating plaintiff's alcohol abuse. Specifically, plaintiff contends that the ALJ disregarded the opinion of psychologist Allison Burner and relied on the opinion of a non-examining psychologist in determining the plaintiff could perform basic work activities if she stopped the substance use. Plaintiff further argues that the hypothetical question posed to the vocational expert was erroneous because it did not contain the limitations found by Ms. Burner.

In 1996, the Social Security Act was amended to reflect changes in the award of benefits with respect to claimants suffering from a substance use disorder. The statute reads, in pertinent part, that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). Under the Commissioner's implementing regulations, 20 C.F.R. § 404.1535(b), the Commissioner must first determine whether the claimant is disabled without segregating out any effects that might be due to substance use disorders. . . . If the gross total of a claimant's limitations, including the effects of substance use disorders suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent. Brueggeman v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2008) (citations omitted).

Here, the ALJ followed this procedure and found that plaintiff's impairments, including the substance use disorder, meet listings 12.02, 12.04, and 12.09. (Tr. 12). The ALJ next found that, if plaintiff stopped the substance use, plaintiff would continue to have a severe impairment or combination of impairments, but plaintiff's impairments would not meet or medically equal a listing

(Tr. 13). The ALJ concluded that, if plaintiff stopped the substance abuse, she could perform jobs that exist in significant number sin the national economy. (Tr. 16). The question remains as to whether substantial evidence supports this conclusion, or put another way, whether substantial evidence supports the ALJ's residual functional capacity ("RFC") assessment.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ made the following determination regarding plaintiff's residual functional capacity:

If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can understand, remember and carry out at least simple instructions and non-detailed tasks. The claimant is able to demonstrate adequate

judgment to make simple, work-related decisions. The claimant can respond appropriately to supervisors and coworkers. She can adapt t routine and simple work changes. She should not work in a setting that includes constant or regular contact with the general public. She should not perform work that includes more than infrequent handling of customer complaints. The claimant should not work in close proximity to available controlled substances.

(Tr. 14).

In support of his determination, the ALJ first discussed evidence regarding plaintiff's credibility. The ALJ noted that there are no medical records for the period of March 2009 through February 2010. (Tr. 15). The ALJ stated that plaintiff has not been under the care of a doctor or mental health professional since leaving the sober house despite her allegations of debilitating mental illness. (Id.). The ALJ also pointed out that plaintiff has been inconsistent with reports of alcohol use. (Id.). Specifically, the ALJ noted that plaintiff told Ms. Burner in February 2010 that she had been sober for two year, yet at the hearing, she admitted to a relapse in November 2009. (Id.). The ALJ then indicated that he was giving "little weight" to the opinion of Ms. Burner and "some weight" to the opinion of non-examining psychologist Dr. Cottone. (Tr. 15-16).

The ALJ erred in determining plaintiff's residual functional capacity. The ALJ noted that there are no records from the period of March 2009 through February 2010 and that plaintiff was not under the care of a doctor or mental health professional at the time of the hearing. (Tr. 15). Plaintiff, however, was a resident at Crestwood Health Care nursing home during part of this period, from October 2008 through August 2009, during which she received regular mental health treatment. (Tr. 25-26, 341). After being released from the nursing home, plaintiff lived at Harris House, a "sober house," until November 2009. (Tr. 26). Plaintiff testified she received medical care and mental health treatment, including medication refills, at a clinic when she lived at Harris House. (Tr. 28). Although plaintiff testified that she has not seen a psychiatrist or other mental health professional in the two-

month period since leaving Harris House, she indicated that she has had her medications refilled. (Tr. 29). The fact that plaintiff, who is uninsured, had not seen a psychiatrist in a two-month period does not detract significantly from her credibility.

The ALJ pointed out that plaintiff told Ms. Burner in February 2010 that she had been sober for two years, yet at the hearing, she admitted to a relapse in November 2009. (Tr. 15). Plaintiff testified at the hearing that she drank for two days after leaving Harris House in November 2009, and that she had not had a drink since that time. (Tr. 27). While it is true that this inconsistency affects plaintiff's credibility, plaintiff's omission of her two-day relapse to Ms. Burner is the only such inconsistency in the record.

The ALJ erred in analyzing the medical opinion evidence. Ms. Burner, a licensed psychologist, evaluated plaintiff after the administrative hearing at the request of the ALJ on February 26, 2010. (Tr. 344-48). Ms. Burner stated that plaintiff's mental status examination was outside normal limits in terms of short-term memory and mental control and that plaintiff's records have also documented past mental status changes with confusion and disorientation at times. (Tr. 347). Ms. Burner stated that plaintiff "presented a complex clinical picture and without complete neurocognitive testing, a definitive diagnosis is difficult to make." (Id.). Ms. Burner stated that, although plaintiff's DePaul records indicate that her memory issues, mental status changes, and mental health issues are related to alcoholism, plaintiff had not had a drink in two years and had not experienced any return of functioning. (Id.). Ms. Burner noted that plaintiff meets criteria for depression due to continual suicidal ideation with one severe attempt. (Id.). Ms. Burner stated that plaintiff feels hopeless, helpless, has crying spells, feels anxious and doesn't know why, and generally feels confused and overwhelmed. (Id.). Ms. Burner concluded that there is significant psychological symptomology

which would negatively affect obtaining or maintaining employment at that time and likely preclude working. (Id.). Ms. Burner stated that plaintiff reported symptoms consistent with cognitive disorder likely due to early onset dementia which causes personality changes (depression and binge drinking) and mental status changes (confusion and disorientation as well as memory issues). (Tr. 348). Ms. Burner stated that plaintiff has developed multiple cognitive deficits including memory impairment, language disturbance, motor disturbance, and disturbance in executive functioning. (Id.). Ms. Burner diagnosed plaintiff with cognitive disorder NOS and assessed a GAF score of 50. (Id.). Ms. Burner expressed the opinion that plaintiff had marked impairment in her activities of daily living; social functioning; concentration, pace, and persistence; and decompensation in a work setting. (Id.).

Ms. Burner also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (Tr. 349-51). Ms. Burner expressed the opinion that plaintiff had extreme limitations in her ability to carry out complex instructions, make judgments on complex work-related decisions, and respond appropriately to usual work situations and to changes in a routine work setting. (Id.). Ms. Burner found that plaintiff had marked limitations in her ability to understand and remember simple instructions, carry out simple instructions, make judgments on simple work-related decisions, understand and remember complex instructions, interact appropriately with the public, interact appropriately with supervisors, and interact appropriately with co-workers. (Id.). In support of her findings, Ms. Burner stated that plaintiff's mental status and personality changes have led to a significant decrease in the ability to understand and engage in simple tasks. (Tr. 349). Ms. Burner stated that plaintiff is easily overwhelmed, has an intolerance for stress, and has difficulty planning, organizing, and sequencing. (Tr. 350). Finally, Ms. Burner noted that plaintiffs has below average adaptive and daily living skills; erratic and unstable moods, including depressive episodes; and a past

history of binge drinking. (Id.).

The ALJ assigned "little weight" to Ms. Burner's opinion. (Tr. 16). The ALJ questioned the validity of the diagnosis of cognitive disorder not otherwise specified, noting that Ms. Burner observed that plaintiff appeared heavily medicated, that Ms. Burner stated that plaintiff presented a "complex clinical picture" for which a definitive diagnosis was difficult to make without "complete neurocognitive testing," and that plaintiff was not diagnosed with a cognitive disorder during her hospitalization following the suicide attempt. (Tr. 15). The ALJ also pointed out the fact that plaintiff did not report her two-day relapse in November 2009 to Ms. Burner. (Tr. 16). The ALJ concluded that Ms. Burner's opinion is "more likely based on claimant's subjective complaints, where she alleged an inability to complete simple tasks and a "worsening of functioning during the alleged 2 year sobriety." (Id.).

Ms. Burner's opinion is supported by her own examination and the other objective medical evidence. Ms. Burner noted that plaintiff had difficulty providing her year of birth and phone number, her immediate memory was not intact, plaintiff was unable to perform basic arithmetic, and her mental control was inadequate. (Tr. 346). Mr. Burner stated that plaintiff has developed multiple cognitive deficits including memory impairment, language disturbance, motor disturbance, and disturbance in executive function. (Tr. 348). Ms. Burner's examination, therefore, supports her diagnosis and her opinion regarding plaintiff's work-related limitations. Ms. Burner also cited other medical evidence in support of her diagnosis, including records from DePaul Health Center. Ms. Burner stated that plaintiff's records from DePaul did not diagnose dementia yet the records noted that plaintiff was found wandering around, confused and disoriented and unable to speak. (Tr. 344). The fact that Ms. Burner acknowledged that plaintiff's case was complex and that a definitive diagnosis was

difficult without complete neurocognitive testing does not discount Ms. Burner's findings. Ms. Burner's opinion was based on her own findings on examination and on a review of plaintiff's medical records. As such, the ALJ's finding that Ms. Burner's opinion was based solely on plaintiff's subjective complaints lacks support. Further, although plaintiff did not disclose her two-day relapse in November 2009, plaintiff testified that she had not consumed alcohol since this time and there is no evidence to the contrary. A two-day relapse three months prior to Ms. Burner's examination would not invalidate Ms. Burner's findings.

Ms. Burner's opinion is also consistent with the record as a whole. As Ms. Burner mentioned, plaintiff was hospitalized on September 11, 2008 due to severe confusion. (Tr. 196). Plaintiff was diagnosed with acute encephalopathy with delirium, likely alcohol withdrawal, alcohol abuse with history of binge drinking, depression, and anxiety. (Tr. 197). On September 14, 2008, Dr. Baram diagnosed plaintiff with major depressive disorder and assessed a GAF score of 25. (Tr. 301). Plaintiff was hospitalized on September 22, 2008, after a suicide attempt. (Tr. 293). On October 14, 2008, Dr. Baram diagnosed plaintiff with rule out major depressive disorder, severe without psychosis; and alcohol dependence, with a GAF score of 25. (Tr. 293). Dr. Baram expressed the opinion that plaintiff should be released to a controlled environment such as a residential care facility upon discharge due to the high risk of potential suicide. (Tr. 293). Plaintiff was admitted to Crestwood Health Care on October 29, 2008, where she resided until August 2009. (Tr. 341). In a Long-Term Psychiatric Management Initial Evaluation dated March 8, 2009, it was noted that plaintiff's affect was anxious and tearful, plaintiff's insight was fair, plaintiffs judgment was impaired, and plaintiff's mood was anxious and depressed. (Tr. 316). Plaintiff was diagnosed with major depression and was assessed a GAF score of 40. (Id.).

On February 1, 2009, Social Worker Linda Dumas completed a Third Party Function Report, in which she indicated that plaintiff required assistance with most daily activities including dressing, personal care, feeding, and taking medication. (Tr. 141-42). Ms. Dumas stated that plaintiff was unable to go out alone or handle money. (Tr. 143). Mr. Dumas stated that plaintiff's mental illness affected her memory, concentration, ability to follow instructions, and ability to understand. (Tr. 145). Ms. Dumas indicated that plaintiff does not handle stress at all, is easily agitated and gives up, and does not handle change well. (Tr. 146). Ms. Dumas' function report corroborates plaintiff's testimony regarding her limitations. The ALJ acknowledged that Ms. Dumas' statement corroborates plaintiff's allegations yet stated that it "contrasts sharply with the other evidence of record, which renders it less persuasive." (Tr. 15). The ALJ, however, did not point to any evidence that conflicts with Ms. Dumas' statement.

After improperly discrediting the opinion of Ms. Burner, the ALJ indicated that he was assigning "some weight" to the opinion of Dr. Cottone. (Tr. 16). Dr. Cottone, a non-examining state agency psychologist, completed a Psychiatric Review Technique on March 23, 2009. Dr. Cottone found that plaintiff had marked limitations in all categories and met listing 12.09, yet expressed the opinion that "[w]ith sustained abstinence her symptoms should remit to a degree she can work simple work." (Tr. 327). Dr. Cottone also completed a Mental Residual Functional Capacity Assessment, in which he concluded that plaintiff could understand, remember, carry out and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to ordinary changes in work routine or setting. (Tr. 331). The ALJ adopted Dr. Cottone's findings in his residual functional capacity. (Tr. 14).

The ALJ's residual functional capacity determination is not supported by substantial evidence.

The ALJ relied on the opinion of non-examining state agency psychologist Dr. Cottone. Dr. Cottone's opinion that with sustained abstinence, plaintiff should be capable of performing simple work is unsupported by the record. The objective medical evidence discussed above reveals that plaintiff experiences significant psychiatric symptoms even during prolonged periods of abstinence from alcohol. Plaintiff was placed in a nursing facility for ten months due to the severity of her psychiatric impairments and the significant risk of suicide she posed. It is notable that plaintiff was abstinent during her ten-month stay at the nursing facility yet still experienced significant mental limitations, as is evidenced by the psychiatric evaluation performed on March 8, 2009, which assessed a GAF score of only 40. (Tr. 316). The statement of social worker Ms. Dumas is credible and corroborates plaintiff's allegations regarding her significant functional limitations. Plaintiff had been abstinent from alcohol for approximately three months when Ms. Burner examined plaintiff and found that plaintiff exhibited significant psychological symptom ology which would negatively affect obtaining or maintain employment and would likely preclude working. (Tr. 347). The record is devoid of evidence suggesting that a longer period of abstinence would cause plaintiff's psychological symptoms to remit to such a degree that would permit the performance of any work activity.

In sum, the ALJ's residual functional capacity determination is not supported by substantial evidence in the record as a whole. The evidence of record reveals that plaintiff has significant limitations due to her mental impairments. The ALJ improperly discredited the opinion of Ms. Burner and relied on the opinion of a non-examining state agency psychologist. Ms. Burner expressed the opinion that plaintiff had marked impairments in her activities of daily living; social functioning; concentration, pace, and persistence; and decompensation in a work setting. (Tr. 348). The hypothetical posed to the vocational expert was deficient, as it did not include the limitations found

by Ms. Burner.  As such, the vocational expert's testimony in response to the ALJ's flawed hypothetical that plaintiff was able to perform work in the national economy is not supported by substantial evidence.  This court finds that because of her serious mental limitations, plaintiff is not able to perform work on a sustained basis in the competitive and stressful conditions in which real people work in the real world.  In a case such as this, where the record "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate."  Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1991).

Accordingly, the undersigned recommends that this matter be reversed and remanded to the Commissioner for the award of Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C.

§ 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the

Commissioner for the award of Disability Insurance Benefits and Supplemental Security Income

benefits.

The parties are advised that they have fourteen (14) days in which to file written objections to this

Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for

good cause is obtained, and that failure to file timely objections may result in a waiver of the right

to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this __14th__ day of November, 2011.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE